

# THE ATTORNEY GENERAL
## OF TEXAS

June 24, 1988

**JIM MATTOX**
**ATTORNEY GENERAL**

Honorable Roy Blake
Chairman
Senate Administration
Texas State Senate
P. O. Box 12068
Austin, Texas  78769

Opinion No.  JM-922

Re: Whether commercial feed  lots
are    subject  to the Texas  Feed
Control Act of 1957  (RQ-1314)

Honorable Bill Haley
Chairman
Public Education Committee
Texas House of Representatives
P. O. Box 2910
Austin, Texas  78722

Gentlemen:

You ask that we examine Attorney General Opinions C-105
(1963) and H-895 (1976) to determine whether they  correctly
decided that commercial  feed lots  are not  subject to  the
Texas Commercial Feed Control Act of 1957.

The Texas  Commercial Feed  Control Act  of 1957[1]  was
enacted <u>to protect the purchasers  of feed</u>. In setting  out
the public necessity  for the act  in the emergency  clause,
the legislature noted:

> The fact that  present laws  are not  ade-
> quate to regulate the manufacture and sale of
> commercial  feed  in  Texas;  the  fact  that

---

1. The  act  was  originally  found  at  article  3881e,
V.T.C.S.,  but  is  now  codified  as  chapter  141  of  the
Agriculture Code.  The act has been amended only once.  Acts
1977, 65th Leg., ch. 641 at 1629.  That amendment,  relating
to the inspection fee provided by the act, has no bearing on
what transactions are covered by  the act.  Revision of  the
act as  chapter  141 of  the  Agriculture Code  was  without
substantive change.  Agric. Code. § 1.001.

> raisers in Texas  of livestock, poultry,  and
> other animals  need  uniform  guaranties  and
> labeling of feeds which are offered to  them;
> and the  further fact  that  it would  be  of
> great material advantage to have the laws  of
> Texas conform insofar as practicable with the
> present-day practices  of  feeders  and  feed
> manufacturers, and to afford maximum  protec-
> tion to  the purchasers  of feed,  create  an
> emergency  and  imperative  public  necessity
> . . . .

Acts 1957, 55th Leg., ch. 23, § 21 at 46.

Six years after  the passage of  the act, the  attorney general  was  called  upon  to  advise  whether  the  act's provisions apply  to a  commercial feed  lot that  contracts with the owner of  stock to keep and  feed the stock at  the feed lot.  Attorney General Opinion C-105 (1963)  determined that it did not.  The basis for the holding in C-105 is that rather than selling feed to  a purchaser, a commercial  feed lot performs  a service,  the keeping  of stock,  for  which feeding is incidental.  In traditional terms, feed lot oper-ators are engaged  in "agistment," the  bailment of  animals for the purpose  of grazing and  pasturing.  See Barclay  v. Burge, 245 S.W.2d 1021 (Tex.  Civ. App. - Beaumont 1952,  no writ).  The distinction between  sale and service  separates those who are  subject to the  act from those  who are  not. Feeding animals as  part of agistment  is not  "distributing feed" within  the  meaning  of  the  Texas  Commercial  Feed Control Act of 1957.

The distinction between sale  and service is often  in-exact.  In this  context, however, when  the distinction  as applied is considered  against the background  of the  act's policy, it stands to reason.  As set out in the act's  emer-gency clause, the policy  behind the act  is to protect  the purchasers of  feed.  When  a rancher  buys  feed  to  give directly to his own stock, he is protected as a purchaser by the act.  When a rancher contracts  with a feed lot to  keep and feed his stock, he is not protected by the act, since he is not a  purchaser, but he  is protected under  the law  of agistment as a bailor.  If the stock is damaged, the  burden of proof is  upon the feed  lot as bailee  to show that  the damage was not caused by negligence on the feed lot's  part. Barclay v. Burge,   245   S.W.2d   at   1022-23.   So   the sale-service distinction as applied  is consistent with  the policy behind the act.

Although this may be a close question, we are not interpreting the act for the first time.  In the quarter of a century that has passed since Attorney General Opinion C-105 was issued, no court has rejected this office's interpretation of the act, and the legislature has not amended the act so as to make clear any intention to cover commercial feed lots.  We view this legislative inaction as dispositive of this question of statutory interpretation. Since 1963 the legislature has met in regular session fifteen times.  By failing to amend this act, the legislature has sanctioned the construction set out in Attorney General Opinion C-105.

Our conclusion, however, is supported by more than this twenty-five year failure to amend the act.  In 1976, at the behest of the House Agriculture and Livestock Committee, this office reviewed Attorney General Opinion C-105.  Just before the opening of the 1977 regular session of the 65th Legislature, this office advised the House Agriculture and Livestock Committee in Attorney General Opinion H-895 (1976) that it reaffirmed Attorney General Opinion C-105.  Yet even though the 65th Legislature is the only legislature to ever amend the act (Acts 1977, 65th Leg., ch. 641 at 1629), it did not amend the act so as to reject Attorney General Opinion C-105.  When an act is amended in some respect, but not amended to change a construction placed on the act by the attorney general, that is strong evidence of legislative sanction of the attorney general's construction. See San Antonio Union Junior College Dist. v. Daniel, 206 S.W.2d 995, 998 (Tex. 1947).

As further evidence of legislative sanction of this office's construction, the 67th Legislature adopted a revision of the statutes relating to agriculture, incorporating them into the Agriculture Code, and again chose not to amend the act. See Acts 1981, 67th Leg., ch. 388 at 1012.  When the legislature reenacts a statute without change, the legislature is presumed to have ratified prior statutory constructions. Marmon v. Mustang Aviation, Inc., 430 S.W.2d 182, 187 (Tex. 1968); Federal Crude Oil Co. v. Yount-Lee Oil Co., 52 S.W.2d 56, 62 (Tex. 1932).  Given all this evidence of legislative approval of this office's construction, we are not inclined to overrule Attorney General Opinion C-105.

Moreover, with respect to the Texas Feed Control Act of 1957, this office has for twenty-five years advised that commercial feed lot operators do not come within its terms and are therefore not subject to its criminal sanctions, found in subchapter G of chapter 141 of the Agriculture Code.  Given this criminal liability, only the very most

compelling reasons would cause us to change our view of  the
scope of the act.

As one reason, it  is suggested that  when the act  was
revised and  incorporated  into the  Agriculture  Code,  its
terms were changed  so that they  now cover commercial  feed
lots.  The  argument runs  as  follows:  By  omitting  any
definition of  "sell" in  section  141.001 and  by  defining
"distribute"  to   mean   "otherwise  supply"   in   section
141.001(6),  the  legislature  rejected  the  sale-service
distinction and thereby subjected commercial feed lot owners
to chapter 141 of the Agriculture Code.

In fact, however, the terms of the act were not changed
by the  adoption of  the Agriculture  Code.  Former  article
3881e, section  3,  provided  in  pertinent  part  (emphasis
added):

    (b)    The  term  "sell"  or  "sale"  includes
           exchange.

    (c)    The term "distribute" means to offer for
           sale, sell, barter, or <u>otherwise  supply</u>
           commercial feeds.

The  Agriculture  Code  provides  in  section  141.001(6)
(emphasis added):

    'Distribute' means sell,  offer for  sale,
barter, exchange, or <u>otherwise supply</u>.

Thus both the original  version and the codification  always
applied to  feed  that  was  <u>otherwise  supplied</u>.  Attorney
General  Opinion  C-105  simply  held  that  what  is  being
supplied by  a commercial  feed  lot is  <u>not</u> feed,  but  the
service of keeping stock.

The revision of the  Texas Commercial Feed Control  Act
of 1957, when  codified as  chapter 141  of the  Agriculture
Code, made no change  in the law,  as construed in  Attorney
General Opinion C-105.  Moreover, we  do not  think that  a
change as significant as broadening the scope of the act can
be inferred from such a  subtle revision of the  definitions
of the statute.

It is  also  suggested as  a  reason for  changing  our
interpretation that  the sale-service  distinction makes  no
sense in light of the  operations of modern commercial  feed
lots.  We have  reviewed the  materials submitted  regarding
modern commercial feed lots.  Modern lots share with lots of

thirty years ago the characteristic of being bailees of the stock they keep. If it is desirable, however, in light of modern operations to provide owners of stock protection beyond their status as bailors by subjecting commercial feed lots to chapter 141 of the Agriculture Code, that is a policy matter for the legislature. See Moss v. Gibbs, 370 S.W.2d 452, 458 (Tex. 1963).

## S U M M A R Y

Having reconsidered Attorney General Opinions C-105 and H-895, we again hold that the Texas Commercial Feed Control Act of 1957, now codified as chapter 141 of the Agriculture Code, does not apply to feed lots which merely keep and feed stock for the owner.

Very truly yours,

JIM MATTOX
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by F. Scott McCown
Assistant Attorney General